UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL HOOTSTEIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 3:23-30057-KAR |
| | ) | |
| TOWN OF SHUTESBURY,  POLICE | ) | |
| CHIEF KRISTIN BURGESS & MARY | ) | |
| ANNE ANTONELLIS, in their | ) | |
| individual and official capacities, | ) | |
| Defendants. | ) | |

**MEMORANDUM & ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**
(Dkt. No. 104)

## I.    Introduction

In this proceeding, self-represented plaintiff Michael Hootstein ("Plaintiff") asserts

claims pursuant to 42 U.S.C. § 1983 of retaliation for the exercise of his First Amendment rights

(Count I), violation of his rights under the Fourth and Fourteenth Amendments to the United

States Constitution (Count II), and *Monell* liability against the Town of Shutesbury (Count III).

He also brings a pendant state law claim pursuant to the Massachusetts Civil Rights Act, Mass.

Gen. Laws ch. 12, § 11I ("MCRA") (Count IV), a claim for intentional infliction of emotional

distress (IIED) (Count V), and a free-standing claim for punitive damages (Count VI).  The

defendants are the Town of Shutesbury (the "Town" or "Shutesbury"), its police chief, Kristin

Burgess ("Burgess" or "Chief Burgess"), and its library director, Mary Anne Antonellis

("Antonellis") (collectively, "Defendants").  The parties consented to this court's jurisdiction for

all purposes through trial (Dkt. No. 14).  *See* Fed. R. Civ. P. 73(b); 28 U.S.C. § 636(c).

Pending before the court is Defendants' motion for summary judgment (Dkt. No. 104).

For reasons set forth below, the motion is GRANTED as to Plaintiff's First Amendment

retaliation claim as against Burgess (Count I), his Fourth Amendment claim as against Antonellis and his due process claim as against Antonellis and Burgess (Count II), his *Monell* liability claim (Count III), his MCRA claim (Count IV), and his IIED claim (Count V), but DENIED as to his First Amendment retaliation claim as against Antonellis (Count I) and his Fourth Amendment claim as against Burgess (Count II).

## II.    Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' when a rational factfinder could resolve it either direction." *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)). "A fact is 'material' when its (non)existence could change a case's outcome. *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor. *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d

411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st

Cir. 2015)).

III.    **Facts**[1]

At the relevant time, Burgess was the Chief of Police for the Town of Shutesbury, where

Plaintiff resides (DF ¶¶ 1, 6).  Antonellis was the Director of the Shutesbury Public Library (DF

¶ 4).  A new facility to house the library was currently under construction at Lot O-32, a wooded

21-acre lot located on Leverett Road in Shutesbury (DF ¶¶ 7-8).  The Town engaged Fuss &

O'Neill, Inc., to conduct an environmental investigation into the soil and groundwater at Lot O-

32 in connection with the siting of the library on the lot (DF ¶ 9).

Plaintiff's case centers around complaints he raised against the Town and its officials

related to what he views as hazardous waste dangers to drinking water, wetlands, and human

health, including those associated with constructing the new library on Lot O-32.  On April 21,

2021, Plaintiff sent an email to the Town Board of Health ("BOH") and the Town Administrator

Becky Torres requesting data underlying a map, which he characterized as identifying his

neighborhood and the firehouse neighborhood as "suspected pfas [polyfluoroalkyl substances]

hotspot areas" (PR ¶ 101).  BOH member Al Werner, upon learning of Plaintiff's inquiry about

the PFAS testing, emailed "Arleen" and "Cat" saying, "you are [Plaintiff's] current lightning rod

for all that he thinks unfair in the world…. [Plaintiff] is clearly not well and I'm sorry you are

the focus of his rage" (PR ¶ 101; Dkt. No. 96-10).  Plaintiff responded by sending an email to

Werner, copying the BOH and the Town Administrator, asserting that Werner's email was

"hurtful, unprofessional, hostile, and defamatory," and that his "attempt to silence [Plaintiff] was

---

[1] Defendants' facts as set forth in Dkt. No. 106 are referred to as "DF ¶ _," and Plaintiff's
responses as set forth in Dkt. No. 122 are referred to as "PR ¶ _."

unacceptable;" Plaintiff requested an "immediate apology" from Werner and indicated that his email should be considered a "formal complaint" against Werner (PR ¶ 102; Dkt. No. 96-11). Werner later apologized to Plaintiff, indicating that it was "insensitive" of him to have suggested Plaintiff was "not well," but asking Plaintiff to treat the BOH and its members with "the respect and consideration they deserve" (PR ¶ 103; Dkt. No. 96-10).  On April 26, 2021, Plaintiff filed an Open Meeting Law complaint against the BOH with the Office of the Attorney General, Division of Open Government, which resulted in a finding that the BOH violated the Open Meeting Law in only one of the instances about which Plaintiff complained, via an April 22, 2021, email (PR ¶¶ 104-105; Dkt. No. 96-15).

On June 6, 2022, Antonellis reported to Chief Burgess that Plaintiff had called her many times and loudly and angrily expressed his displeasure about the new library, and she asked Burgess to make a log entry in the event Plaintiff's behavior escalated (DF ¶¶ 19-20; Dkt. No. 106-1 at ¶ 19).  Plaintiff denies ever making any phone calls to Antonellis or ever speaking to her loudly or angrily, but he does not dispute that Antonellis reported to Burgess that he was making loud and angry calls to her about the new library (PR ¶¶ 19-20).  The following day, Plaintiff filed a complaint against the Town related to Lot O-32 with the Shutesbury Conservation Commission ("the Conservation Commission"), and, on June 23, 2022, another with the Massachusetts Department of Environmental Protection ("DEP") (PR ¶¶ 106-107).  The Conservation Commission put Plaintiff's complaint on the agenda for its July 28, 2022, meeting, and Plaintiff notified the chair that he was concerned he might become a target for personal attacks during the public meeting (PR ¶¶ 108-09).  On August 12, 2022, the Conservation Commission issued an Enforcement Order against Shutesbury relating to its findings that the Town had taken actions with respect to Lot O-32 that violated the Wetlands Protection Act and

its regulations (Dkt. 96-25). Thereafter, on August 23, 2022, Plaintiff filed another complaint against the Town related to Lot O-32 with the DEP (PR ¶ 114).

Months later, on November 18, 2022, Plaintiff went to Lot O-32 to observe Fuss & O'Neill conduct environmental testing on the site (DF ¶ 21). An official from MassDEP and Antonellis were there as well (DF ¶¶ 21-22). The details of Plaintiff's encounter with Antonellis are disputed, but, according to Plaintiff, Antonellis immediately approached him, attempted to block his path to the area where the testing was to occur, and told him he was not "allowed" on the property (PR ¶ 23). Plaintiff was able to move past Antonellis without making physical contact by "bob[bing] and weav[ing]" around her (PR ¶ 23). A small group consisting of about nine people, including Shutesbury Police Officer Nathaniel Masse, was gathered around an idling backhoe on the site (DF ¶ 26; PR ¶ 23). As Plaintiff tried to walk toward Officer Masse, Antonellis stood in his way with her face inches from his, leading Plaintiff to tell her that she was invading his personal space and if she did not back up, he was going to ask the officer to arrest her (PR ¶ 23). At that point, Antonellis went to speak with Officer Masse, who advised her that there were no legal grounds for restricting Plaintiff from observing the testing on the town-owned site notwithstanding her explanation of the potential for liability for the Town (DF ¶¶ 24-25; PR ¶ 23). According to Plaintiff, Antonellis responded to Officer Masse saying, "I'm the library director and I'm going to build the library on this site .... Fuss & O'Neill is working for me" (PR ¶ 23). Withal, Plaintiff remained on the site for the next four to five hours and, upon returning home, left a voice message for Chief Burgess praising Officer Masse and making a complaint against Antonellis (DF ¶ 27; PR ¶ 23).

A pivotal encounter between the parties took place at Lot O-32 on April 18, 2023, at about 12:15 p.m., when Plaintiff stopped by the site upon seeing a Fuss & O'Neill truck there

(PR ¶32).  Plaintiff parked his car in a friend's driveway adjacent to the lot and walked over to

the truck, where he met Clifford Otis, the Fuss & O'Neill surveyor on site (PR ¶ 32).  Upon

being informed by Otis that new observation wells had been installed to determine the extent of

hazardous waste contamination at the site, Plaintiff proceeded to walk toward the wells to

photograph them and determine their elevations (PR ¶ 32).  Following this interaction, Otis

called a Fuss & O'Neill supervisor, Timothy Clinton, who called Antonellis (DF ¶¶ 33-34; PR ¶¶

33-34).  According to Antonellis, Clinton told her that "residents were at Lot O-32, harassing the

Engineer," leading her to conclude there was an emergency there (Dkt. 106-2 at ¶¶ 29, 32).

Antonellis denies knowing that Plaintiff was the subject of Clinton's report because he only

referenced "residents" being at the site (Dkt. No. 106-2 at ¶ 30).  Antonellis ended the call with

Clinton and immediately called Burgess to advise her of Clinton's report and ask for assistance

at Lot O-32 (Dkt. No. 106-2 at ¶¶ 33-35).  Burgess corroborates Antonellis, averring that when

Antonellis called her, Antonellis stated "this is an emergency, I just received a phone call from

Fuss & O'Neill's office from the supervisor that there were residents at the Lot O-32 and they

are harassing the worker" (DF ¶ 35; Dkt. No. 106-1 at ¶¶ 21, 23).  Plaintiff points to a May 5,

2023, email from Clinton to Antonellis to dispute the content of Clinton's call to Antonellis.

According to the email, Otis called Clinton to report that a citizen who Otis believed was

Plaintiff had entered the site, introduced himself as "opposition to the library," and begun

photographing the monitoring wells where Otis was working; Clinton called to report "the same"

to Antonellis (PR ¶ 33; Dkt. No. 96-36).[2]  Following Antonellis's call, Burgess contacted

---

[2] Plaintiff also purports to dispute the content of Antonellis's call to Burgess by asserting that
"the facts of this case suggest Defendants Burgess and Antonellis conspired to file a false police
complaint against [Plaintiff] to predetermine and justify the conspirators' joint assault via police
of [him] without probable cause."  This is a speculative and argumentative assertion that is not

Shelburne Control Dispatch to advise that she would be responding to the call that came through the station regarding a possible disturbance, and she and Officer Devon Pelletier proceeded to Lot O-32 (DF ¶¶ 36-37).

Plaintiff took photographs of the observation wells at Lot O-32 until 1:05 p.m. As he was walking back out of the wooded lot to his car, Plaintiff saw Chief Burgess, Officer Pelletier, and Antonellis walking toward him about 300 yards into the work zone (PR ¶ 32; DF ¶¶ 42, 44-45). Burgess did not believe any other residents were at the site at the time because the only vehicles she observed at the lot were the Fuss & O'Neill truck and Antonellis's car; she saw Plaintiff's car parked in an adjacent driveway (DF ¶¶ 38-39). Antonellis proceeded to walk past Plaintiff towards the worksite where he had just been, while Burgess blocked Plaintiff's path and Pelletier stood close by off to her side (PR ¶ 32; DF ¶ 47). Antonellis stayed at the worksite for the remainder of the encounter, where she could not see Burgess and Pelletier talking to Plaintiff but she could hear them (DF ¶ 48).[3] The parties dispute many of the details of the ensuing confrontation. For purposes of Defendants' motion for summary judgment, the court recounts the particulars to which the parties agree and, as to those which they do not, Plaintiff's version to the extent it is substantiated by citation to the record.

Chief Burgess said she needed to speak to Plaintiff regarding a call she had received reporting that residents were at the lot harassing workers "to get to the bottom of what happened" (DF ¶ 53; PR ¶ 32). Plaintiff responded that he was walking back to his car, whereupon Burgess

---

supported by any indicia of admissible evidence, and it serves no purpose in the summary judgment calculus.

[3] Plaintiff purports to dispute this fact by reference to his recollection of the encounter as set forth in his affidavit, but, because he lacks personal knowledge as to what Antonellis could hear or see, nothing in his affidavit creates a material dispute about Antonellis's ability to hear but not see the encounter between Plaintiff and the Shutesbury police officers (PR ¶ 48).

and Pelletier attempted to block Plaintiff's path (DF ¶¶ 54-55). Plaintiff maintains that he told Burgess that Antonellis was using her to harass and intimidate him, that he did not feel safe being detained in the middle of the woods with no witnesses, and that Burgess's detention of him was unlawful and in violation of his constitutional rights (PR ¶ 32). Chief Burgess refused Plaintiff's request that she go speak with Otis while Plaintiff walked back to his car to wait with Officer Pelletier (PR ¶ 32). Instead, Burgess put Plaintiff in a shoulder hold and began to physically drag him further into the woods where Antonellis and Otis were so that they could "all discuss this quietly as adults" (PR ¶ 32). The parties do not dispute that Plaintiff exclaimed "[n]o you cannot drag me into the woods," but, while Defendants maintain that Burgess had not touched Plaintiff at the time but rather only gestured into the woods, Plaintiff contends that Burgess actively tried to drag him into the woods (DF ¶¶ 57-58; PR ¶ 32). When Plaintiff pulled away from Burgess, she patted her gun, taser, and handcuffs and threatened him with a video she claimed to have of him asking her to illegally "fix" a speeding ticket for his grandson (PR ¶ 32). The parties agree that Burgess told Plaintiff he was not free to leave, that Plaintiff asked if he was arrested (although they disagree about the tone and tenor of his question), and that Burgess responded, "[n]o but you are being detained for an investigation" (DF ¶¶ 61-63). Plaintiff stated he had not done anything criminal and was insistent on leaving, notwithstanding Burgess reiterating multiple times that she and Pelletier were investigating what had happened (DF ¶¶ 64-65). Burgess told Plaintiff she would have to handcuff him if he would not go with them to have a discussion with Antonellis and Otis (PR ¶ 32). When Plaintiff persisted in his refusal, Burgess and Pelletier yanked Plaintiff's arms behind his back and cuffed him (PR ¶ 32). Burgess then put the handcuffed Plaintiff in a shoulder hold for a second time and started to drag him into the

woods once more, but Plaintiff again broke free, spun around 180 degrees, and fell to his knees in the mud, whereupon he proceeded to have a panic attack (PR ¶ 32).

After approximately ten minutes, Burgess told Plaintiff she would remove the handcuffs if he stood up and remained calm, and Plaintiff did so, at which time Burgess took off the cuffs (DF ¶¶ 72-74; PR ¶ 32). During this interval, Pelletier had gone to speak to Otis, and when Pelletier returned about ten minutes later, he indicated that Otis's report of events was consistent with Plaintiff's and there had been no apparent criminal activity (DF ¶ 76; PR ¶ 32). Burgess told Plaintiff that he was free to go, but she walked back with him to his car (DF ¶¶ 78, 80; PR ¶ 32). Plaintiff stated that he wished to file a complaint, that Burgess had no basis for an investigation, and that the call she had received regarding the harassment was not a valid call (DF ¶¶ 79, 82). Burgess listened to Plaintiff's complaints and tried to explain to him the law regarding investigations (DF ¶¶ 81, 83). Burgess also told Plaintiff she was going to speak to Antonellis and perhaps investigate her for filing a false complaint against Plaintiff (PR ¶ 32). Burgess and Pelletier then took a statement from Antonellis and returned to the station (DF ¶¶ 84-85). When Plaintiff called Burgess thirty minutes later to ask for any video footage from their recent encounter, Burgess advised him that she did not have any because she had not had time to grab her bodycam when she was running out of the station following the emergency call from Antonellis (PR ¶ 32).

Plaintiff had made a "nuisance complaint" to the Town of Shutesbury Board of Health regarding the siting of the new library at Lot O-32 on April 22, 2023, six days before this encounter at Lot O-32 (DF ¶ 29). Plaintiff claims that what happened to him on April 18, 2023, was in retaliation for him filling this complaint. Plaintiff points to a statement he says Burgess made to him that day that she "admired" his advocacy work in opposition to the building of the

library on Lot O-32 as evidence of her knowledge of the complaint (PR ¶ 29).[4]  Burgess and

Antonellis claim they were unaware that Plaintiff had filed a nuisance complaint on April 18,

2023 (DF ¶¶ 28-29).

All current polices of the Shutesbury Police Department have been approved by the

Town Selectboard, and none of Chief Burgess's policy proposals have gone into effect without

the express approval of the Selectboard (DF ¶¶ 2-3)[5].  Antonellis has no policymaking authority

with respect to work zones (DF ¶ 5).[6]

---

[4] Plaintiff also argues that there is evidence of Antonellis's knowledge based on his
representation that it is "common knowledge" that Antonellis and the Board of Health Chair
"were in daily communications conspiring on behalf of the town behind closed government
doors with one goal in mind – building a new town library on the Mass DEP regulated hazardous
Lot O-32 waste site, costs, public health and safety be damned" (PR ¶ 29).  Again, this
speculative assertion has no evidentiary value because it is unsupported by any indicia of
admissible evidence.  *See Leavitt v. Corr. Med. Servs., Inc.*, Civ. No. 8-132-B-W, 2009 WL
103549, at *3 (D. Me. Jan. 13, 2009), *rec. dec. adopted,* Civil No. 08-132-B-W, 2009 WL
465813 (D. Me. Feb. 24, 2009) ("At the very least, [the plaintiff] would need to divulge the
underlying factual basis for his conclusory statement about what is common knowledge, which is
something he has not offered."); Fed. R. Evid. 401.

[5] Plaintiff purports to dispute these facts by selectively quoting from Chief Burgess's contract,
which indicates that her employment is under the provisions of Mass. Gen. Laws ch. 41, § 97A,
and by asserting that Defendants fail to properly support their assertion by citation to the record.
As Plaintiff points out, the contract provides that Burgess will be "in complete charge of the
Police Department and shall have full authority and responsibility … for formulating polices and
administering the affairs of the Police Department …."   Plaintiff fails to acknowledge that the
contract further provides that said authority and responsibility are "subject to the general
direction of the Selectboard through the office of the Town Administrator" (Dkt. No. 96-8).
Thus, neither this contractual provision nor the provisions of Mass. Gen. Laws ch. 41, § 97A
conflict with the Defendants' statements of fact, which, contrary to Plaintiff's representation, are
directly supported by Burgess's affidavit, which is made on personal knowledge (Dkt. No. 106-1
at ¶¶ 3-4).

[6] Plaintiff's reliance on a statement made by Antonellis on November 18, 2022, that "I'm the
library director and I'm going to build the library on this site," does not create a material dispute
as to this fact, which is properly supported by Antonellis's affidavit (Dkt. No. 106-2 at ¶ 3).

## IV.    Discussion

### A.  First Amendment Retaliation Claim Against All Defendants

Plaintiff's first claim is that Defendants unlawfully retaliated against him in violation of the First Amendment because he spoke out critically against the Town's plan to build the new public library on Lot O-32, which he viewed as posing a danger to public health and the environment.  "The First Amendment guarantees the 'public interest in having free and unhindered debate on matters of public importance.'"  *Rosaura Bldg. Corp. v. Municipality of Mayagüez*, 778 F.3d 55, 66 (1st Cir. 2015) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968).  The government may not "impos[e] burdens on persons that discourage or punish them from exercising protected constitutional rights."  *Id.* (citing *Ramírez v. Arlequín*, 447 F.3d 19, 22 (1st Cir. 2006)).  "[T]o establish a prima facie case of First Amendment retaliation, [Plaintiff] must prove that 1) '[he] engaged in First Amendment-protected conduct,' 2) '[he] suffered an adverse action,' and 3) '[his] protected conduct played a "substantial or motivating" part in the adverse action.'"  *President & Fellows of Harvard Coll. v. United States Dep't of Health & Human Servs.*, Nos. 25-cv-11048-ADB & 25-cv-10910-ADB, 2025 WL 2528380, at *22 (D. Mass. Sept. 3, 2025) (quoting *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 n.4 (1st Cir. 2024)).  "A 'plaintiff pressing a retaliatory arrest claim must [also] plead and prove the absence of probable cause for the arrest.'"  *Velez v. Eutzy*, 152 F.4th 292, 300 (1st Cir 2025) (alteration in original) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019)).  If the plaintiff makes the required showing, the defendants "'may then avoid a finding of liability by showing that "[they] would have reached the same decision … even in the absence of the protected conduct."'"  *Id.*

(alteration in original) (quoting *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012)).

Defendants do not dispute that Plaintiff engaged in protected speech about the Town's plan to build the new public library on Lot O-32.  Nevertheless, they argue that they are entitled to summary judgment because the only action Plaintiff has identified that qualifies as adverse is Burgess's seizure of him on April 18, 2023, and that the record, viewed in Plaintiff's favor, does not support a finding that retaliation for Plaintiff's speech played any part in motivating Burgess's actions that day.  Defendants also argue that Burgess's actions were supported by probable cause.

Adverse action in the context of First Amendment retaliation "need only be more than '*de minimis*,' which the First Circuit has defined simply as sufficient to chill a 'reasonably hardy' person, or 'a person of ordinary firmness,' from continuing to exercise their constitutional rights." *Huffman v. City of Boston*, No. 21-cv-10986-ADB, 2022 WL 2308937, at *4 (D. Mass. June 27, 2022) (quoting *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011)).  Plaintiff identifies the following as adverse actions: (1) Antonellis's June 6, 2022, false report to Burgess that Plaintiff was making loud and angry phone calls to her expressing his displeasure with the new library being built on Lot O-32; (2) Antonellis's November 18, 2022, encounter with Plaintiff on Lot O-32 when she accosted him about not being "allowed" on the site, attempted to block his path, and invaded his personal space; (3) Antonellis's April 18, 2023, false report to Burgess that Clinton had told her residents were at Lot O-32 harassing the Fuss & O'Neill engineer; and (4) Burgess's seizure and assault of Plaintiff on April 18, 2023.

Regarding Antonellis's June 6, 2022, report to Burgess, the court is not convinced that being the subject of a false notification of non-criminal conduct to the police would chill a

"reasonably hardy" person from exercising his First Amendment rights.  Antonellis's only request to Burgess was that she make a log entry regarding the report in the event of escalation, not that she investigate Plaintiff for criminal acts.  Moreover, Plaintiff neither alleges nor offers evidence showing that he was aware of Antonellis's call to Burgess at the time.  Accordingly, there is no factual basis to support a finding that Antonellis's false report of non-criminal conduct to law enforcement could have "communicated to [Plaintiff] that his exercise of his First Amendment rights spelled trouble and [he] should cease." *Alston v. Speigel*, 988 F.3d 564, 576 (1st Cir. 2021) (finding that the distribution of a letter attacking the plaintiff's credibility could not constitute an adverse action for purposes of a First Amendment retaliation claim because the plaintiff failed to allege that he knew about it when he was pursing his grievances against his employer such that it could have had a chilling effect on him).  Absent a basis for finding that Antonellis's call could reasonably have had the effect of chilling Plaintiff's speech, Plaintiff has not established the adverse action element of his prima facie case with respect to this call.

Next, the court finds that Antonellis's telling Plaintiff on November 18, 2022, that he was not "allowed" on Lot O-32 and attempting to block his path is not enough to chill the speech of a "reasonably hardy" person.  Plaintiff does not claim that Antonellis's actions that day were threatening or that he was cowed by them; to the contrary, he avers that his response was to bob and weave past her and warn her that he was going to report her to the on-site Shutesbury police officer for invading his personal space if she did not cease (Dkt. No. 121-1 at 6).  Withal, even if Plaintiff found Antonellis's statement and attempt to block him from Lot O-32 threatening, "[n]ot every vague threat will support a First Amendment claim." *Artus v. Town of Atkinson*, No. 09-cv-87-PB, 2009 WL 3336013, at *8 (D.N.H. Oct. 14, 2009) (finding the plaintiff's allegation that a police officer told the plaintiff's son that the plaintiff had better "watch what he

says in Town" insufficient to state a First Amendment retaliation claim).  Antonellis's words and

actions on November 18, 2022, viewed in the light most favorable to Plaintiff, were de minimis

and cannot support a First Amendment retaliation claim as a matter of law.

To the extent Plaintiff's First Amendment claim is premised on Antonellis's call to

Burgess on April 18, 2023, reporting that "residents" were at Lot O-32 "harassing" the Fuss &

O'Neill engineer, however, it is sufficient to survive summary judgment as to Antonellis.

Plaintiff's theory is that Antonellis lied to Burgess about what Clinton had reported to her.[7]

According to an email from Clinton memorializing the conversation, he passed on to Antonellis

the information that Otis had passed on to him, namely that a citizen who Otis believed was

Plaintiff had entered the site and approached him, introduced himself as "opposition to the

library," and begun photographing the new monitoring wells (Dkt. No. 96-36).  If Clinton were

to so testify at trial and a factfinder were to credit his testimony over Antonellis's, then it would

be reasonable to infer that Antonellis falsely reported to Burgess what Clinton had told her to

provoke an unjustified emergency police response to Lot O-32 where Antonellis knew they

would find Plaintiff.  A reasonable trier of fact could conclude that being subjected to such an

encounter with law enforcement might deter a reasonably hardy individual from engaging in

further protected speech regarding the suitability of Lot O-32 for the new library.  *Huffman*, 2022

WL 2308937, at *4.

---

[7] Clinton's out-of-court statement, offered for the purpose of showing the effect the statement
had on Antonellis, is not hearsay.  *See United States v. Pena*, 24 F.4th 46, 61 (1st Cir. 2022)
(quoting *United States v. Cruz-Díaz*, 550 F.3d 169, 176 (1st Cir. 2008)) ("'Out of court
statements offered not to prove the truth of the matter asserted but merely to show context – such
as a statement offered for the limited purpose of showing what effect the statement had on the
listener – are,' by definition, 'not hearsay' and thus not excludable under Rule 802.").

Having cleared the adverse action hurdle for purposes of summary judgment with respect to Antonellis's April 18, 2023, call, Plaintiff next must show that there is a triable issue as to whether "'[his] protected conduct played a "substantial or motivating" part in the adverse action.'" *President & Fellows of Harvard Coll.*, 2025 WL 2528380, at *22 (quoting *Berge*, 107 F.4th at 37 n.4). With respect to Antonellis, Plaintiff has done so. While Antonellis disputes her knowledge of Plaintiff's nuisance complaint filed six days earlier, the record establishes that at least by June 6, 2022 – when Antonellis contacted Burgess asking her to make a log entry of allegedly harassing calls by Plaintiff – Antonellis knew that Plaintiff opposed the building of the new library on Lot O-32, and the record supports an inference that Antonellis, as Library Director, would have been aware at least generally of Plaintiff's other protected speech against building the new library on Lot O-32 for environmental and human health reasons. This speech stood in direct opposition to her own stated interest in seeing the new library constructed on the lot. Antonellis also knew, following the November 18, 2022, encounter, that Plaintiff was legally permitted to be on the lot, as she had been so informed by Officer Masse. These facts are sufficient to satisfy Plaintiff's prima facie burden to show a triable issue as to whether his speech in opposition to the siting of the new library played a "substantial or motivating part" in Antonellis's alleged false report to Burgess on April 18, 2023, that "residents" were at the lot "harassing" the engineer, when Plaintiff was on the lot taking pictures of the new monitoring wells in furtherance of his opposition to constructing the library on Lot O-32. *Berge*, 107 F.4th at 37 n.4.

Notwithstanding that Plaintiff has satisfied his burden with respect to a prima facie case, Defendants would be entitled to summary judgment if there was undisputed evidence that Antonellis would have taken the same action in the absence of Plaintiff's protected conduct.

Defendants have pointed to no such evidence. *Velez*, 152 F.4th at 300. Defendants nevertheless argue that they are entitled to summary judgment because "[c]ourts have not been receptive to retaliation claims arising out of government speech." *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013). Defendants argue that Antonellis had an obligation to inform Burgess concerning the report she had received from Clinton, which was a matter of public concern. *Id*. at 30. However, the case Defendants rely on for support is readily distinguishable. In *Goldstein*, the First Circuit affirmed dismissal of the plaintiff's First Amendment retaliation claim where the plaintiff had alleged that the Secretary of State had included his name in "a run-of-the-mill website announcement," but not that it was either false or misleading. *Id*. *See also Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 142-143 (1st Cir. 2016) (affirming judgment on the pleadings in favor of the defendant where the plaintiff real estate developer's allegation of first amendment retaliation was premised on allegedly "fabricated, false, inflammatory, and baseless" statements made by the water district superintendent but with no indication in the record that the health concerns the superintendent raised were not genuinely held). Here, on the other hand, Plaintiff's claim, which has support in the record, is that Antonellis's statement to Burgess that "residents" were at Lot O-32 "harassing" the engineer was knowingly false and designed to lead to an unjustified police encounter with Plaintiff. Thus, Defendants are not entitled to summary judgment insofar as Plaintiff's claim against Antonellis is based on her April 18, 2023, call to Burgess.

    This leaves Defendants' assertion that Antonellis is protected from liability for Plaintiff's claim by the doctrine of qualified immunity. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982).  The two-part test applicable to the defense of qualified immunity are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).  The second part of the test further breaks down into two inquires: (a) whether the legal contours of the right in question were sufficiently clear that a reasonable [defendant] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [defendant] would have understood that his conduct violated the right."  *Ciolino v. Gikas*, 861 F.3d 296, 303 (1st Cir. 2017).

"'[A]n officer is entitled to qualified immunity "[i]f ... an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate [the plaintiffs'] rights."'"  *Johnson v. City of Biddeford*, 92 F.4th 367, 375 (1st Cir. 2024) (quoting *Stamps v. Town of Framingham*, 813 F.3d 27, 34 n.7 (1st Cir. 2016)).  "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'"  *Id*. at 376 (quoting *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014)).  Thus, "immunity will issue when 'officers of reasonable competence could disagree' on the lawfulness of an action, but it will not issue if 'it is obvious that no reasonably competent officer would have concluded' that the action was lawful."  *Lopera v. Town of Coventry*, 640 F.3d 388, 396 (1st Cir. 2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 342 (1986)).  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *United States v. Lanier*, 520 U.S. 259, 269-70 (1997)), so long as the unlawfulness of the action is

apparent in light of pre-existing law at the time of the alleged violation. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The First Circuit has described the decision on qualified immunity at the summary judgment stage as "tricky" because, "in qualified immunity summary-judgment cases, it's a tug of war, really, between who gets the benefit of the doubt: summary judgment 'requires absolute deference to the nonmovant's factual assertions,' while qualified immunity 'demands deference to the reasonable, if mistaken, actions of the movant.'" *Justiniano v. Walker*, 986 F.3d 11, 27 (1st Cir. 2021) (quoting *Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009)). The way to resolve this tension according to the First Circuit is to "fram[e] the factual events according to summary judgment's traditional leeway to the nonmoving party's version of events, and then ask[ ] whether, given that story, "a reasonable officer should have known that his actions were unlawful.'" *Id.* (quoting *Morelli*, 552 F.3d at 19).

Defendants frame the qualified immunity issue as to Antonellis as whether, "a reasonable public official could conclude that they had an obligation to … inform he police of any concerns that were reported to them" (Dkt. No. 111 at 8). This construct is flawed because Plaintiff has not alleged that his First Amendment rights were violated by Antonellis passing on truthful concerning information she received from Clinton to Burgess. Rather, Plaintiff claims – and there is support in the record for his contention – that Antonellis received information from Clinton that Plaintiff was present on the lot holding himself out as opposition to the library and taking pictures and that she falsely reported to Burgess that there was an emergency situation at the lot where unknown residents were harassing the engineer and a police response was needed. "Because qualified immunity is an affirmative defense to liability, the burden is on the defendants to prove the existence of circumstances sufficient to bring the defense into play."

*Alston v. Town of Brookline*, 997 F.3d 23, 51 (1st Cir. 2021).  Where Defendants have premised their qualified immunity argument on their version of the facts, they have failed to meet their qualified immunity burden on summary judgment.  *See id.*; *see also Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019).

Finally, the court turns to Burgess's seizure of and assault on Plaintiff on April 18, 2023. Plaintiff has satisfied the adverse action requirement where Burgess's actions, viewed in the light most favorable to Plaintiff, would be sufficient to chill a "'"reasonably hardy" person, or a "person of ordinary firmness" from continuing to exercise their constitutional rights.'"  *Bixby v. Town of Rehoboth*, Civil Action No. 23-10334-MPK, 2024 WL 4979147, at * 7 (D. Mass. Dec. 4, 2024) (quoting *Huffman*, 2022 WL 2308937, at *4) (finding that the plaintiff's allegations that he was subjected to a traffic stop without cause on the orders of the police chief in retaliation for speech critical of the chief satisfied the adverse action requirement for a First Amendment retaliation claim).

Nevertheless, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim against Burgess due to the absence of evidence of causation, the third element of Plaintiff's prima facie case.  To establish causation, Plaintiff must introduce enough evidence to support a finding that the protected conduct – here, Plaintiff's speech against the Town's plan to build the public library on Lot O-32 – "was a substantial motivating factor behind" the adverse action.  *McGunigle v. City of Quincy*, 835 F.3d 192, 202 (1st Cir. 2016).  "'It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured – the motive must <u>cause</u> the injury.'"  *Salmon v. Lang*, 57 F.4th 296, 312 (1st Cir. 2022) (quoting *Nieves*, 587 U.S. at 398).  "That is, 'it must be a "but-for" cause, meaning that the

adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Id*. (quoting *Nieves*, 587 U.S. at 399).

Personal capacity claims under Section 1983 must be premised on an individual's own acts or omissions. *See, e.g., Doe 1 v. City of Holyoke*, 725 F. Supp. 3d 115, 126 (D. Mass. 2024); *Echavarria v. Roach*, 565 F. Supp. 3d 51, 77 (D. Mass. 2021).  While Plaintiff baldly claims that Burgess retaliated against him because he spoke out against building the new library on Lot O-32, he has not pointed to any evidence that Burgess, as opposed to Antonellis or any other town official or employee, harbored retaliatory animus against him for this stance.  His allegations of conspiracy rely on nothing more than "conclusory allegations, speculation, and improbable inference." *Echavarria*, 565 F. Supp. 3d at 93.  Plaintiff seeks to rely on the temporal proximity between his April 12, 2023, nuisance complaint against the Town and the April 18, 2023, incident at Lot O-32, but this contention is insufficient to raise an inference of causation in the absence of evidence that Burgess was aware of the recent complaint.  While Plaintiff purports to dispute Burgess's ignorance of his complaint, he offers no evidence tending to establish her knowledge.  Temporal proximity alone is insufficient to prove knowledge. *See Delaney v. Town of Abington*, 890 F.3d 1, 7-8 (1st Cir. 2018) (rejecting the plaintiff's argument that the employer's knowledge of his protected expression could be inferred from the temporal proximity to the adverse employment action).  Even accepting Plaintiff's representation that Burgess told him on April 18, 2023, that she "admired" his advocacy work in opposition to the building of the library on Lot O-32, as the court must, this statement does nothing to establish Burgess's knowledge of the April 12, 2023, nuisance complaint.  The statement made no reference to a nuisance complaint or to any other recent protected activity by Plaintiff. *See id*. at 7 (rejecting an

inference of knowledge based on a comment by the defendant when it made no reference to the protected activity).

The record supports a finding that Burgess was aware generally of Plaintiff's opposition to the siting of the new library on Lot O-32 both because of Antonellis's June 6, 2022, report to Burgess about Plaintiff's allegedly harassing phone calls and Burgess's statement to Plaintiff on April 18, 2023, that she admired his advocacy work.  However, a jury could not reasonably conclude that there was a causal connection between Plaintiff's protected activity and Burgess's seizure of and assault on Plaintiff on April 18, 2023, where there is no direct or circumstantial evidence from which a factfinder could infer that Burgess had any interest in seeing the library constructed on Lot O-32.  Because Plaintiff fails to make out a prima facie case of retaliation as to Burgess's actions on April 18, 2023, she is entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

B. Fourth Amendment Unlawful Seizure and Excessive Force Claim Against Burgess and Antonellis

In the second count of his complaint, Plaintiff claims that on April 18, 2023, Burgess and Antonellis unreasonably seized him in the absence of reasonable suspicion or probable cause and used excessive force against him in violation of his rights under the Fourth Amendment.  There is no evidence that the library director played any role in seizing or using force against Plaintiff.  Plaintiff's reference to Antonellis as a "de facto" police officer is not supported factually or by citation to legal authority and carries no weight (Dkt. No. 121 at 1).  For this reason, Antonellis is entitled to judgment in her favor on Count II.  *See Echavarria*, 565 F. Supp. 3d at 77.

As to Burgess, Defendants argue first that Plaintiff was not seized until he was handcuffed and that the handcuffing of Plaintiff was reasonable because of its brevity.  Alternatively, Defendants maintain that, whether Plaintiff was seized before or after Burgess's

use of handcuffs, the seizure was justified as a *Terry* stop, the scope of which was reasonable, and that handcuffing Plaintiff did not constitute excessive force.

"'Under the Fourth Amendment, a seizure occurs when a police officer, by means of physical force or a[n oral] show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Holloway*, 499 F.3d 114, 117 (1st Cir. 2007) (quoting *United States v. Sealey*, 30 F.3d 7, 7 (1st Cir. 1994)). However, "a seizure requires that the citizen must actually submit to the show of authority." *Id*. (citing *California v. Hodari D.*, 499 U.S 621, 626-29 (1991); *United States v. Smith*, 423 F.3d 25, 28-29 (1st Cir. 2005)). On this basis, Defendants argue that Plaintiff was not seized within the meaning of the Fourth Amendment until Burgess used force, i.e. handcuffs, to restrain him because he refused to submit to her earlier oral show of authority. Defendants' argument is unavailing on the summary judgment record.

Viewing the record in Plaintiff's favor, Burgess and Pelletier were entitled to approach Plaintiff on the lot to "ask [him] questions without triggering the protections of the Fourth Amendment." *Smith*, 423 F.3d at 28 (quoting *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997)). "The real question … is not whether the police were entitled to approach [Plaintiff] to ask him a few questions, but, rather, whether they did so in a manner that would have communicated to a reasonable person that he was not free to refuse to answer and walk away." *Id*. at 29. If a reasonable person would have believed he was not free to leave without responding, then the questioning constitutes a detention under the Fourth Amendment. *Id*. Relevant circumstances that might indicate a seizure include: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

It is undisputed that Burgess and Pelletier attempted to block Plaintiff's path back to his car and that Burgess told Plaintiff he was not free to leave. Moreover, according to Plaintiff, Burgess refused to allow him to return to his car with Pelletier while she spoke to Otis, who he indicated would confirm that nothing criminal had occurred. Instead, she put him in a shoulder hold and attempted to force him back to the worksite. When that tactic failed, she patted her gun, taser, and handcuffs and told Plaintiff that she would have to handcuff him if he refused to go to the worksite of his own volition. Thus, a factfinder accepting Plaintiff's version of events could justifiably conclude that "[a] reasonable person in [Plaintiff's] position would not have felt free to disregard the police and go about his business," well before Burgess's use of handcuffs. *United States v. Dapolito*, 713 F.3d 141, 152 (1st Cir. 2013) (citing *United States v. Espinoza*, 490 F.3d 41, 49 (1st Cir. 2007)) (considering as indicative of detention the presence of three police officers who told the defendant he would be taken to jail and would be searched despite his indicating that he did not want to be searched, as well as the fact that defendant felt he needed permission even to step back three steps, which was denied). Burgess and Pelletier were physically blocking Plaintiff from leaving, and Burgess explicitly told him he was not free to leave. Thereafter, Burgess implemented a shoulder hold, which alone would constitute a seizure within the meaning of the Fourth Amendment. *See United States v. Dubose*, 579 F.3d 117, 121 (1st Cir. 2009) ("Physical force alone is a seizure." (citing *Hodari D.*, 499 U.S. at 624-25)).

Defendants' asserted justification for Plaintiff's seizure, whenever it occurred, is that it was a lawful *Terry* stop. "In determining whether a *Terry* stop is justified, [the] inquiry involves two steps, first, 'whether the officer's action was justified at its inception,' and second, 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Schubert v. City of Springfield*, 589 F.3d 496, 501 (1st Cir. 2009) (quoting *Terry v.*

*Ohio*, 392 U.S. 1, 20 (1968)).  As to the initial stop, the police must have "reasonable suspicion

… rooted in 'a particularized and objective basis' for suspecting illegal conduct on the part of the

person stopped."  *Id*. (quoting *United States v. Wright*, 582 F.3d 199, 205 (1st Cir. 2009)).

"'[T]he relevant inquiry is an objective one based on all "the cumulative information available to

[the officers]" at the time of the search [or stop].'"  *United States v. Langston*, 110 F.4th 408,

422 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 581 (2024) (quoting *United States v. Qin*, 57 F.4th

343, 349 n.7 (1st Cir. 2023))).

Defendants argue that Burgess's stop of Plaintiff was justified because the information

conveyed in Antonellis's call to Burgess, combined with Plaintiff's evasive and irrational

behavior upon encountering Burgess at the site created a sufficiently ambiguous situation as to

whether criminal activity had occurred (Dkt. No. 111 at p. 14).  For support, Defendants rely on

*Wright*, in which the First Circuit noted that "the Supreme Court has stressed that a *Terry* stop is

permitted even if 'the conduct justifying the stop was ambiguous and susceptible of an innocent

explanation.'"  *Id*., 582 F.3d at 213 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000))

(concluding that the defendant's actions in leaning forward in a car that was parked partially

blocking an entrance to a mini-mart, quickly exiting the car as if recognizing the police car when

it stopped nearby, running in the opposite direction of the police car, clutching at his side as if

holding something, and refusing to stop when ordered to do so were sufficiently ambiguous as to

create a reasonable, articulable suspicion of criminal activity).  *Id*.  Defendants' argument is not

persuasive.

"While no perfectly precise definition of reasonable suspicion exists, it is well established

that, in terms of the continuum of knowledge, reasonable suspicion requires more than a mere

hunch but less than probable cause.  *United States v. Ruidíaz*, 529 F.3d 25, 29 (1st Cir. 2008)

(citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Romain,* 393 F.3d 63, 71 (1st Cir. 2004)).  Such suspicion may be rooted in "presumptively reliable information about criminal activity … provided by third parties."  *Id*. (citing *Romain*, 393 F.3d at 71).  While Plaintiff makes a passing claim that Antonellis's information was not the kind of trustworthy information on which Burgess reasonably could rely, he makes no effort to substantiate this assertion, and the court is aware of no reason that Burgess should not have been entitled to rely on a call from the Town Library Director.  Burgess could reasonably believe that Antonellis, as the Library Director, would be a point of contact for the Town's environmental consultant regarding problems at the site of the new library.  That said, a report of residents harassing the Fuss & O'Neill worker carried no indication that would justify Burgess in presuming that "criminal harassment," as that term is defined in the Massachusetts Criminal Code, had occurred or was occurring.[8]  Nor did the report include any claims of other possibly criminal conduct, such as destruction of property or assault on the worker.  The fact that the report came to Burgess not through a 911 call, but through Antonellis, who was not at the site, further detracts from a reasonable suspicion of criminal activity.  *Contrast Eldredge v. Town of Falmouth*, 662 F.3d 100, 106-07 (1st Cir. 2011) ("Here, [the officer] was responding to a 911 call in which a fearful caller relayed an urgent situation that was still unfolding – namely, that her ex-boyfriend, who had been drinking, had already 'trashed' the inside of her home where children were present and at the time of the call was continuing his destructive behavior outside.").

---

[8] "Criminal harassment" involves the willful and malicious engagement in a "knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms the person and would cause a reasonable person to suffer substantial emotional distress," or the "knowing[ ] distribut[ion of] visual material … depicting another person … who is nude, partially nude or engaged in sexual conduct and to whom the distribution causes physical or emotional injury or substantial emotional distress …."  Mass. Gen. Laws ch. 265, § 43A.

Defendants, perhaps implicitly acknowledging the difficulty of presuming criminal activity based on Antonellis's call alone, rely also on Plaintiff's behavior when Burgess arrived at the site. However, the record viewed in Plaintiff's favor does not establish that he behaved evasively or irrationally upon encountering Burgess. His indication that he was fearful about being stopped in the woods by the police is neither evasive nor irrational in the sense of giving rise to a likelihood of criminal activity. Nor was his suggestion that Burgess go speak to Otis while he waited with Pelletier suspicious or unreasonable. Indeed, the parties agree that the matter was ultimately cleared up by having Pelletier go speak to Otis, who reported no criminal actions on Plaintiff's part, while Burgess waited with Plaintiff. Thus, the court cannot conclude as a matter of law on this summary judgment record that Burgess's encounter with Plaintiff was justifiable as a *Terry* stop.

Moreover, the court disagrees with Defendants' position that Burgess's use of handcuffs on Plaintiff did not exceed the scope of a *Terry* stop as a matter of law. "If a stop begins as a *Terry* stop but becomes too intrusive, it will morph into a de facto arrest." *United States v. Rasberry*, 882 F.3d 241, 247 (1st Cir. 2018) (citing *Hayes v. Florida*, 470 U.S. 811, 815-16 (1985); *United States v. Acosta-Colon*, 157 F.3d 9, 14 (1st Cir. 1998)). Determining whether a stop remains within the bounds of a *Terry* stop or has exceeded them requires consideration of all the surrounding circumstances, with the ultimate inquiry being "whether a reasonable person standing in the suspect's shoes would have understood his position 'to be tantamount to being under arrest.'" *Id*. (quoting *Unites States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994)). The use of handcuffs is "often indicative of an arrest but does not of itself convert a *Terry* stop into a de facto arrest." *Acosta-Colon*, 157 F.3d at 18. That said, the use of security precautions, including handcuffs, "must be based on the officers' 'reasonable belief that the use of such restraints was

necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.'" *Rasberry*, 882 F.3d at 247-48 (quoting *Acosta-Colon*, 157 F.3d at 19)). "When the government intends to justify the use of handcuffs in the context of a *Terry* stop it must 'point to some specific fact or circumstance that could have supported a reasonable belief" that the use of handcuffs was necessary." *United States v. Carrigan*, 724 F.3d 39, 47 (1st Cir. 2013), *abrogated on other grounds by Mathis v. United States*, 579 U.S. 500 (2016) (quoting *United States v. Meadows*, 571 F.3d 131, 141 (1st Cir. 2009)). The facts or circumstances Defendants offer here to justify the use of handcuffs on Plaintiff are that he was uncooperative in answering questions, insistent on leaving, and behaving irrationally. Viewing the record in the light most favorable to Plaintiff, this justification is insufficient. Plaintiff's behavior at the time of the encounter is the subject of significant factual dispute. Moreover, even if Plaintiff was being uncooperative or even irrational without threatening or taking dangerous actions, Defendants fail to explain how these facts or circumstances would support Burgess's reasonable belief that handcuffing Plaintiff was necessary to avoid exposing him or anyone else to an undue risk of harm. *Rasberry*, 882 F.3d at 247-48. Thus, there is a material dispute as to whether Burgess's use of handcuffs impermissibly exceeded the scope of a *Terry* stop.[9]

Defendants also seek summary judgment on Plaintiff's claim of excessive force. In moving for summary judgment, Defendants seek to characterize Burgess handcuffing Plaintiff's arms behind his back as reasonable "to effectuate the purpose of the stop," noting that the cuffing

---

[9] In seeking summary judgment, Defendants do not argue that the undisputed record establishes the presence of probable cause for an arrest that would justify the use of handcuffs. Defendants argued probable cause for arrest in their opposition to Plaintiff's motion for summary judgment based on evidence that Plaintiff assaulted Burgess during the encounter. Recognizing that this constitutes a factual dispute between the parties, Defendants do not advance that argument here.

lasted less than ten minutes and that Burgess removed the cuffs when Plaintiff agreed to stay calm (Dkt. No. 111 at 20). "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *McGrath v. Tavares*, 757 F.3d 20, 25 (1st Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). "'To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances.'" *Kenney v. Floyd*, 700 F.3d 604, 609 (1st Cir. 2012) (quoting *Jennings v. Jones,* 499 F.3d 2, 11 (1st Cir.2007)). The reasonableness assessment requires an examination of the "totality of the circumstances," paying close attention to the facts of the case "relating to the incident, as then known to the officer." *Tahoun v. Barrasso*, No. 24-cv-12756-DJC, 2025 WL 2254449, at *5 (D. Mass. July 21, 2025) (quoting *Barnes v. Felix*, 605 U.S. 73, 80 (2025)). The law recognizes that reasonable force can be used "merely to detain." *Velez*, 152 F.4th at 300 (citing *United States v. Coplin*, 463 F.3d 96, 102 (1st Cir. 2006)). The excessive force inquiry presents a question of law. *Id*. at 301 (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2025)),

A court approaches the excessive force analysis in two steps. First, the court determines the relevant facts and circumstances. *Id*. (citing *Scott*, 550 U.S. at 378). Second, the court determines whether, "given those facts, the force used was 'objectively reasonable'" *Id*. (quoting *Scott*, 550 U.S. at 381). Recently, the Supreme Court articulated three important factors to be considered in the analysis: (1) the severity of the crime prompting the stop, (2) the "actions the officer took during the stop, such as giving warnings or otherwise trying to control the encounter" and (3) "the stopped person's conduct" as relating to "the nature and level of the threat he poses, either to the officer or to others." *Barnes*, 605 U.S. at 80. "The border between excessive and acceptable force is often 'hazy,' with the result that 'a reasonable officer

sometimes may use unreasonable force.'" *Velez*, 152 F.4th at 301 (quoting *Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st Cir. 2011)).

Assuming the encounter occurred as Plaintiff avers that it did, Burgess used force on Plaintiff when she put him in a shoulder hold and attempted to steer him to the worksite, when she handcuffed him, and when she put him in a shoulder hold the second time and attempted to steer him to the worksite while handcuffed. The question is whether these actions by Burgess constituted a reasonable amount of force to effectuate a lawful goal of determining whether Plaintiff had committed criminal conduct at the site in his interactions with Otis. The *Barnes* factors favor Plaintiff on this summary judgment record. The reported "harassing" conduct was vague at best, but there was no indication it involved violence or destruction of any kind. The record does not substantiate that Burgess gave Plaintiff any warning before applying the shoulder holds. According to Plaintiff, Burgess did warn him that she was going to handcuff him if he did not agree to go back to the site to talk to Otis, but this was after Burgess refused to go speak to Otis herself while Pelletier waited with Plaintiff. Finally, viewing the record in Plaintiff's favor, he posed no threat to anyone's safety, notwithstanding his protests that the stop was unlawful, where he was in the woods under the surveillance of two armed police officers with no one else around. Given this record, the court cannot conclude as a matter of law that the two shoulder holds and the handcuffing of Plaintiff were appropriate in the circumstances. *Contrast Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 327 (1st Cir. 2015) (affirming the grant of summary judgment in favor of the defendant officer where the record showed that the plaintiff was pushed face first against the wall and had one wrist cuffed while actively attempting to escape arrest).

Defendants nevertheless argue that Burgess is entitled to protection from liability based on the doctrine qualified immunity. As Defendants frame it, "plaintiff cannot identify relevant authority sufficient to put a reasonable police officer on notice that they could not rely on plaintiff's evasiveness and irrational behavior to conclude that reasonable suspicion existed to question plaintiff," nor "to put a reasonable police officer on notice that they could not handcuff a detainee to ensure the safety of the police officer and the detainee while effectuating the purpose of an investigatory stop" (Dkt. No. 111 at 21). As was the case with Antonellis and Plaintiff's First Amendment retaliation claim, this argument for qualified immunity is premised on viewing the record in the light most favorable to Defendants. As a result, they have not met their burden on the affirmative defense of summary judgment at this time. *Alston*, 997 F.3d at 51. In summary, Defendants are not entitled to summary judgment on Plaintiff's excessive force claim against Burgess.

C. Fourteenth Amendment Bodily Integrity Against Burgess and Antonellis

Also in Count II, Plaintiff claims that Defendants Burgess and Antonellis violated his right to bodily integrity in violation of his substantive due process rights, protected by the Fourteenth Amendment. The Supreme Court has held that all claims that police officers used excessive force during an arrest or seizure of a citizen are to be analyzed under the Fourth Amendment's reasonableness standard, not the Fourteenth Amendment's conscience-shocking standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). *See also Estate of Bennett v. Wainwright*, 548 F.3d 155, 163 (1st Cir. 2008) ("The remaining substantive due process claim premised on the deprivation of [the plaintiff's] life interest also fails because this is in essence an excessive force claim that should be – and is – brought under the Fourth Amendment."). Thus,

Defendants are entitled to judgment as a matter of law on Plaintiff's Fourteenth Amendment claim.

    D. _Monell_ Liability against the Town

    Plaintiff seeks to hold the Town liable based on its 2020 hiring of Burgess as a part-time police officer and its 2022 "rushed promotion" of her to chief, as well as its alleged failure to train her (Dkt. No. 121 at 33).[10]  According to Plaintiff, the Town employed Burgess in deliberate indifference to his constitutional rights because she was a novice police officer who did not complete Municipal Police Training Committee ("MPTC") full-time officer academy training in violation of Mass. Gen. Laws ch. 6E, § 4(f)(1), which sets forth as a certification requirement "successful completion of the basic training program approved by the municipal police training committee."[11]  Additionally, Plaintiff maintains the Town should be liable for its failure to train or supervise officers, including Burgess, regarding the use of force and reporting the use of force; officer code of conduct; officer response procedures; criminal investigation procedures; internal affairs and officer complaint investigation procedures; and collection and

---

[10] Plaintiff also references the Town's alleged failure to supervise, investigate, or discipline Burgess, but he has submitted no evidence that the Town did not supervise Burgess, failed to investigate any complaints made against Burgess, or failed to take appropriate discipline against her related to any incidents occurring before the April 18, 2023, encounter such that those alleged failures could have a causal relationship to the Fourth Amendment injuries Burgess allegedly inflicted on Plaintiff during that encounter.  _See Gray_, 917 F.3d at 14 (affirming summary judgment for the defendant municipality where the plaintiff had "tendered no evidence of _past_ violations sufficient to put the Town on notice [of alleged training deficiencies]") (emphasis added).

[11] The MPTC is a state agency within the executive office of public safety charged with setting policies and standards for training law enforcement officers, including municipal police officers. _See_ Mass. Gen. Laws ch. 6, § 116.

preservation of evidence.[12]  Defendants move for summary judgment on the grounds that Plaintiff has not established an underlying constitutional violation, the Town's hiring of Burgess was not plainly deficient, Burgess was adequately trained, and Burgess was not a final policymaking authority for the Town.

To establish municipal liability, a plaintiff must show that "the municipality *itself* causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 387 (1989) (citing *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694-95 (1978)).  A plaintiff bringing a *Monell* claim must establish both that his harm was caused by a constitutional violation and that the municipality itself is responsible for the violation.  *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25-26 (1st Cir. 2005).  Given that the court has determined that Plaintiff cannot establish a First Amendment retaliation claim based on Burgess's conduct, any basis for municipal liability must be based on Burgess's alleged Fourth Amendment violations.  Thus, to survive Defendants' motion for summary judgment, Plaintiff must show that a triable issue exists as to whether, to the extent Burgess violated the Fourth Amendment in seizing Plaintiff or using excessive force, those actions were caused by the Town's erroneous hiring of, or failure to train, Burgess.

The bar for assessing municipal liability under *Monell* is "very high" and requires the plaintiff to show: (1) that the unconstitutional conduct resulted from a municipal policy or custom; (2) that such policy or custom caused the injury, and (3) that the municipality possessed the requisite level of fault, generally labeled "deliberate indifference."  *Id*. at 26 (*Silvo v.*

---

[12] Plaintiff takes his list from Mass. Gen. Laws ch. 6E, § 5, which requires the division of police certification in consultation with the MPTC to establish minimum certification standards as to each item in the list.

*Worden*, 130 F.3d 26, 31-32 (1st Cir. 1997) & *County Comm'rs of Bryan Cty. v. Brown*, 520

U.S. 397, 404 (1997)).  Regarding causality, "'[a] plaintiff must show "a direct link between the

municipality's policy and the constitutional violation."'"  *Rodriguez v. Boston Pub. Schs.*, Civil

No. 19-10116-LTS, 2022 WL 1715189, at *7 (D. Mass. Feb. 25, 2022) (quoting *Armstrong v.

Lamy*, 938 F. Supp. 1018, 1035 (D. Mass. 1996)).  Deliberate indifference requires proof that a

municipal actor "disregarded a known or obvious consequence of his action."  *Connick v.

Thomspon*, 563 U.S. 51, 61 (2011) (citing *Bryan Cty.*, 520 U.S. at 410).

 "[I]t is unclear whether a single hiring decision due to inadequate screening can ever lead

to *Monell* liability."  *Young*, 404 F.3d at 30 (citing *Bryan Cty.*, 520 U.S. at 412).  To the extent it

could, a plaintiff would be required to show that "if the City had performed a full review of the

hired officer's record, the particular constitutional violation committed by the hired officer

would have been a 'plainly obvious consequence' of the hiring decision by the municipality."

*Id*. (quoting *Bryan Cty.*, 520 U.S. at 412-13).  The standard for municipal liability is so high that

"'even when an applicant's background contains complaints of physical violence, including acts

of aggression and assault,' this may still be insufficient to make a City liable for inadequate

screening of an officer who then uses excessive force."  *Id*. at 30-31 (quoting *Morris v. Crawford

Cty.*, 299 F.3d 919, 924 (8th Cir. 2002)).

 There is no evidence in the summary judgment record that the Town had a practice of

inadequately screening the records of police officer candidates or that anything in Burgess's

record would have put the Town on notice that *Terry* stops in the absence of reasonable

suspicion or excessive force would be a "plainly obvious consequence" of hiring her.  *Id*. at 30.

Instead, Plaintiff attempts to premise municipal liability on the Town's alleged violation of

Mass. Gen. Laws ch. 6E, § 4 for hiring Burgess when she had not completed MPTC full-time

officer academy training.  Even if this could form a basis for *Monell* liability for a Fourth

Amendment violation, an unsettled proposition in its own right, what Mass. Gen. Laws ch. 6E, §

4(g) provides is that "[n]o agency shall appoint or employ a person as a law enforcement officer

unless the person is certified by the commission."  The record shows that Burgess was certified.

There is a June 15, 2022, letter from the MPTC Chief Operating Officer indicating that Burgess

"ha[d] fulfilled all of the MPTC basic training requirements for appointment/employment on a

fulltime basis because [she]: … [s]uccessfully completed an MPTC approved Bridge Academy

Training Program AND provided the MPTC with proof of 2,400 hours of law enforcement work

experience … performing specific police duties and functions, including exercising powers of

arrest, AND thereafter obtained an exemption from completing an MPTC operated/approved

fulltime Police Academy" (Dkt. No. 96-7).  To the extent Plaintiff argues that the MPTC should

not have granted the exemption, that contention is irrelevant to his theory that the Town violated

Mass. Gen. Laws ch. 6E, § 4(g) by employing Burgess.

Plaintiff's claim that the Town should be liable for failing to train Burgess is similarly

unavailing.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily

necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 563

U.S. at 62 (quoting *Bryan Cty.*, 520 U.S. at 409).  This is because, "[w]ithout notice that a course

of training is deficient in a particular respect, decisionmakers can hardly be said to have

deliberately chosen a training program that will cause violations of constitutional rights."  *Id*.  In

addition, the identified failure in training must be "closely related to the ultimate injury."  *Young*,

404 F.3d at 26 (quoting *Canton*, 489 U.S. at 391).  "The liability criteria for 'failure to train'

claims are exceptionally stringent."  *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998)

(citing *Canton*, 489 U.S. at 388-89).

Plaintiff does not identify a pattern of similar constitutional violations.[13]  Nor does Plaintiff identify an allegedly deficient training program closely related to his claimed Fourth Amendment injury.  Instead, he speculates that the Town failed to train Burgess at all.  This claim is not borne out by the record, which establishes that Burgess completed the MPTC Bridge Academy Training Program, as well as other training on the use of force (DF ¶¶ 12-18; Dkt. No. 106-1 at ¶¶ 9-10; Dkt. No. 106-4 at 13, 47).[14]  Nor has Plaintiff shown that these programs were imperfect in some way, let alone "quite deficient," such as would be required to establish deliberate indifference.  *Young*, 404 F.3d at 27.

Finally, municipal liability may be imposed for a single decision by a municipal policymaker "where the policymaker possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  "Municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Id.* at 483

---

[13] This includes Plaintiff's representations that other residents filed five complaints against Burgess between February 2025 and April 2025 (PR ¶¶ 188-200).  None of the complaints involve claims of unlawful detention.  Only one complaint, in the form of an unsigned log of events dated March 19, 2025, could possibly be construed as claiming Burgess used improper force.  The log details an alleged incident on August 29, 2022, in which Burgess grabbed a citizen's arm and pushed him out of the way during a response to a motor vehicle that crashed into a telephone pole in front of his house (PR ¶ 197; Dkt. No. 118-4).  From the document, which is dated years after the April 18, 2023 encounter in issue here, it is unclear whether the citizen submitted a complaint at any time before April 18, 2023, accusing Burgess of an improper use of force of which the Town could have become aware.  Absent such evidence, the claim cannot be said to contribute to a finding of a "pattern of similar constitutional violations" for purposes of establishing deliberate indifference on the part of the Town.  *See Gray*, 917 F.3d at 14.

[14] Plaintiff purports to dispute Burgess's training but does not point to evidentiary material or a lack thereof demonstrating a genuine factual dispute as required by Fed. R. Civ. P. 56.

(citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).  "[T]he First Circuit has recognized

that a police chief is a final policymaker in certain circumstances." *Barrett v. Town of Plainville*,

272 F. Supp. 3d 235, 240 (citing *Welch v. Ciampa*, 542 F.3d 927, 941-42 (1st Cit. 2008)).

Plaintiff argues that Burgess was a municipal policymaker for purposes of imposing

*Monell* liability on the Town because she was appointed pursuant to the strong chief statute,

Mass. Gen. Laws ch. 41, § 97A.  The statute, however, "does not confer unreviewable authority

on the police chief: the chief is authorized 'from time to time to make suitable regulations

governing the police department, and the officers thereof, *subject to the approval of the

selectmen*.'" *Woodley v. Town of Nantucket*, 645 F. Supp. 1365, 1377 (D. Mass. 986) (quoting

Mass. Gen. Laws ch. 41, § 97A) (emphasis added)).  This is consistent with Burgess's contract,

which provides that she will be "in complete charge of the operations of the Police Department

and shall have full authority and responsibility, subject to the general direction of the Selectboard

through the office of the Town Administrator …for formulating polices and administering the

affairs of the Police Department …"  (Dkt. No. 96-8).  Nor does the record contain evidence

showing that the Selectboard delegated authority to Burgess regarding officer training in general

or with respect to the Fourth Amendment in particular.  It is uncontested that all current polices

of the Shutesbury Police Department were approved by the Town Selectboard, and none of

Burgess's policy proposals went into effect without the express approval of the Selectboard.

Thus, the record does not establish that Burgess's acts or omissions represented the official

policy of the Town such that it could form the basis for the imposition of municipal liability.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.

E.  <u>Massachusetts Civil Rights Act Against All Defendants</u>

In Count IV of Plaintiff's complaint, he alleges that Defendants violated his civil rights in violation of the Massachusetts Civil Rights Statute ("MCRA"), Mass. Gen. Laws ch. 12, § 11I. "To state a claim under the MCRA, a plaintiff must show that (1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." *Amirault v. City of Malden*, 241 F. Supp. 3d 288, 304 (D. Mass. 2017)).  "Not every violation of law is a violation of the [MCRA].  A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act.  *Longval v. Comm'r of Corr.*, 535 N.E.2d 588, 593 (Mass. 1989) (citing *Pheasant Ridge Assocs. Ltd. Partnership v. Burlington*, 506 N.E.2d 1152,  1158 (Mass. 1987)).  Rather, the defendant must have interfered with a person's rights by means of threats, intimidation, or coercion.  The Supreme Judicial Court of Massachusetts ("SJC") has defined a "threat" to be "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm,"  "intimidation" as "putting in fear for the purpose of compelling or deterring conduct," and "coercion" as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Planned Parenthood League of Mass., Inc. v. Blake*, 631 N.E.2d 985, 990 (Mass. 1994).

Defendants move for summary judgment on the ground that Plaintiff cannot establish a violation of his federal or state constitutional rights, and, to the extent he has alleged such violations, they are direct violations not amounting to violations of the MCRA.  In resisting Defendants' motion for summary judgment, Plaintiff argues that Burgess's use of force on him

on April 18, 2023, represents an "actual or potential threat of physical harm," intended to interfere with his filing of any more protected complaints about the building of the new library on Lot O-32 (Dkt. No. 121 at 44-45).[15]

While Burgess's alleged unlawful seizure and use of force on Plaintiff was "not by itself coercive" under the MCRA, if Burgess "had some further purpose in treating [him] as [she] did, threats, intimidation, or coercion might be involved." *Longval*, 535 N.E.2d at 593. "Here, [Plaintiff] has identified the further purpose: he argues that [Burgess] violated the MCRA by [unlawfully detaining and using excessive force on him] … to prevent his exercise of his free speech rights." *Waterman v. City of Taunton*, 742 F. Supp. 3d 144, 164 (D. Mass. 2024). Seizing and using unreasonable force on "someone to prevent them from taking a constitutionally protected action – here, speech – is coercive under Massachusetts law." *Id*. at 164-65 (citing *Barron v. Kolenda*, 203 N.E.3d 1125, 1140 (Mass. 2023); *Tortora v. Inspector of Bldgs. of Tewksbury*, 668 N.E.2d 876, 878 (Mass. App. Ct. 1996)).

While Plaintiff's contention is theoretically sound, it is not viable on this record. Plaintiff asserts causation based on his filing of a nuisance complaint on or around April 12, 2023. There is, as previously noted, no evidence that Burgess was aware of Plaintiff's April 12, 2023, filing. Plaintiff does not claim that Burgess made any reference to his recently filed nuisance complaint or that she suggested that he should cease from future advocacy work. In other words, there is no basis on which a factfinder could reasonably conclude that Burgess's alleged actions on April 18, 2023, were intended to make Plaintiff fearful about the future exercise of his right to free

---

[15] Plaintiff claims that Antonellis violated the MCRA in the same manner as Burgess. However, as set forth above, there is no evidence that Antonellis seized or used force on Plaintiff, and Plaintiff's speculative, unsupported assertions that Antonellis was working in concert with Burgess are not supported by indicia of admissible evidence.

speech regarding the environmental risks of building on Lot O-32 or coerce him into giving up the future exercise of that right.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's MCRA claim.

F.    <u>Intentional Infliction of Emotional Distress Against All Defendants</u>

Plaintiff's final claim is for intentional infliction of emotional distress.  To prevail on an IIED claim, a plaintiff must prove:

> that the actor intended to inflict emotional distress or that he knew
> or should have known that emotional distress was the likely result
> of his conduct ...; (2) that the conduct was "extreme and
> outrageous," was "beyond all possible bounds of decency" and was
> "utterly intolerable in a civilized community" ...; (3) that the
> actions of the defendant were the cause of the plaintiff's distress ...;
> and (4) that the emotional distress sustained by the plaintiff was
> "severe."

*Miller v. Pugliese*, 693 F. Supp. 3d 163, 183 (D. Mass. 2023) (quoting *Howell v. Enter. Publ'g Co., LLC*, 920 N.E.2d 1, 28 (Mass. 2010)).  "The standard for making a claim of intentional infliction of emotional distress is very high."  *Penate v. Scampini*, 600 F. Supp. 3d 129, 139 (D. Mass. 2022), *aff'd sub nom. Penate v. Sullivan*, 73 F.4th 10 (1st Cir. 2023) (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996)).  A plaintiff must show that the defendant's conduct was "extreme and outrageous," meaning that "it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'"  *Id.* (quoting *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014)).

Plaintiff's claim against the Town is barred by Mass. Gen. Laws ch. 258, § 10(c), which precludes the imposition of municipal liability for "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, [and] intentional emotional distress …."  *See Howcroft v. City of Peabody*, 747 N.E.2d 729,  747 (Mass. App. Ct. 2001) (dismissing the plaintiff's IIED claim against the city pursuant to Mass. Gen. Laws ch. 258, § 10(c)).

Plaintiff's claim against Antonellis is not viable in the absence of evidence that Antonellis played any role in his seizure or in using force against him. Plaintiff's claim against Burgess founders on the second and fourth elements of an IIED claim.

"'[I]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.'" *Miller*, 693 F. Supp. 3d at 184 n.5 (quoting *Caputo v. Bos. Edison Co.*, 924 F.2d 11, 14 (1st Cir. 1991)). "In cases where excessive force has led to a successful IIED claim, the excessive force used was significantly more extreme than the evidence supports in this case, and left serious physical injury." *Id.* (citing *Poy v. Boutselis*, 352 F.3d 479, 485-86 (1st Cir. 2003) (describing evidence that the police struck the plaintiff repeatedly on his face and back, knocked him to the ground and pinioned him, locked his hands behind him and used handcuffs as brass knuckles striking the plaintiff repeatedly on the forehead such that he required stitches and was left with a permanent scar, and led to two months of pain in the plaintiff's shoulder, back, wrist, and head); *Barbosa v. Conlon*, 962 F. Supp. 2d 316, 324, 334 (D. Mass. 2013) (noting evidence that one plaintiff was handcuffed, picked up, thrown against a wall, thrown outside on the porch, dragged to a police cruiser, and denied medical attention at the police station for her injured shoulder, which would require surgery to treat; that another plaintiff who was one week postpartum was handcuffed, dragged by her arm and hair out of the house, pulled down the steps to the police cruiser, and denied medical attention at the police station for bleeding from her cesarean incision; and the final plaintiff was pushed and struck at the police station by multiple officers, requiring medical attention that was again denied); *Turkowitz v. Town of Provincetown*, 914 F. Supp. 2d 62, 67-68, 75 (D. Mass. 2012) (detailing evidence that arresting officers grabbed the back of one plaintiff's head and slammed it into the side of a

house, pushed him into a propane tank while he was handcuffed, kicked him several times, and stomped on his exposed foot and dragged the other plaintiff to their police cruiser and slammed him into the trunk).  Accepting Plaintiff's allegations regarding the shoulder holds and handcuffing as true, this behavior does not rise to the level of extreme and outrageous conduct. *See Lund v. Henderson*, 22 F. Supp. 3d 94, 106 (D. Mass. 2014) (granting summary judgment to defendants on an IIED claim where the police allegedly unlawfully arrested the plaintiff, pulled his hands and twisted his arms behind his back, dragged him to a police cruiser, and pushed his head down to get him into the cruiser).

In addition, "'[u]nder Massachusetts law, a plaintiff must show he suffered 'severe' emotional distress as one of the four elements of an IIED claim." *Miller*, 693 F. Supp. 3d at 183 (quoting *Kennedy v. Town of Billerica*, 617 F.3d 520, 530 (1st Cir. 2010)).  This requires proof of the "kind of distress 'that no reasonable man could be expected to endure.'" *Kennedy*, 617 F.3d at 530 (quoting *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 319 (Mass. 1976)). According to Plaintiff, he suffers from "mental anguish, abuse, anxiety, insomnia, shock, damage to reputation, and public humiliation/shaming" (PR ¶ 201).  Plaintiff does not claim to have sought any physical or mental health treatment.  This is insufficient evidence of distress.  *See Miller*, 693 F. Supp. 3d at 184 (granting summary judgment to the defendants where the plaintiff stated he experienced occasional nightmares and was fearful of police cars, but there was no evidence he sought counseling); *Kennedy*, 617 F.3d at 530 (holding the defendants were entitled to judgment as a matter of law where the minor arrestee feared going to court, was generally nervous and afraid of police sirens, and had occasional nightmares causing sweating and a racing pulse).  Accordingly, summary judgment should enter in favor of Defendants on Plaintiff's IIED claim.

**V.      Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 104) is

GRANTED as to Plaintiff's First Amendment retaliation claim as against Burgess (Count I), his

Fourth Amendment claim as against Antonellis and his due process claim as against Antonellis

and Burgess (Count II), his *Monell* liability claim (Count III), his MCRA claim (Count IV), and

his IIED claim (Count V), but DENIED as to his First Amendment retaliation claim as against

Antonellis (Count I) and his Fourth Amendment claim as against Burgess (Count II).  The parties

are directed to request a mutually convenient date for a status conference from the Clerk's

Office.

It is so ordered.

Dated:  December 8, 2025                              Katherine A. Robertson
                                                                    KATHERINE A. ROBERTSON
                                                                    U.S. MAGISTRATE JUDGE